UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROXANNE LOCKHART,

    Plaintiff,

v.

GAINWELL TECHNOLOGIES LLC,

    Defendant.
_____/

Case No. 2:23-cv-12335

Honorable Susan K. DeClercq
United States District Judge

**OPINION AND ORDER DENYING MOTION TO DISMISS (ECF No. 6)**

Plaintiff RoxAnne Lockhart alleges retaliatory termination and racial discrimination by her former employer, Defendant Gainwell Technologies LLC, after she raised concerns about compliance under the Ohio Single Pharmacy Benefit Manager (SPBM) contract. However, her claims are clouded by a Release Agreement she signed with her actual employer, Diversified Systems Inc. (DSI), which purports to release all claims against DSI's clients and customers, including Gainwell. Nonetheless, as explained below, Gainwell's motion to dismiss will be denied.

**I. BACKGROUND**

At the motion-to-dismiss stage, Lockhart's allegations must be accepted as true and all reasonable inferences drawn in her favor. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008).

Lockhart was employed with Diversified Systems Inc. (DSI), a service provider that supplies staff and resources to various entities, including Gainwell. ECF No. 1 at PageID.5. Lockhart was hired as the Chief Compliance Officer for Gainwell's Ohio Single Pharmacy Benefit Manager (Ohio SPBM) contract, which mandated federal and state compliance in administering Ohio's Medicaid program. *Id.* at PageID.8.

From June 2021 to September 2022, Lockhart raised numerous concerns regarding Gainwell's adherence to compliance requirements stipulated under the Ohio SPBM contract. *Id.* at PageID.11–12. During her tenure, Lockhart encountered resistance from Gainwell's management, including Vice President of Pharmacy Tim Nolan and Corporate Compliance Officer Anne Terwilliger, regarding the implementation of compliance measures and fraud -prevention tools. *See id.* at PageID.12–16. Lockhart filed internal complaints about noncompliance and raised issues about potential fraud that she alleges were not adequately addressed. *Id.* at PageID.17–25.

In June 2023, DSI and Lockhart entered into a General Release and Settlement Agreement under which Lockhart agreed to release all claims against DSI and its "partnerships, members, customers, clients, agents, attorneys, predecessors, successors, assigns, purchasers, principals, and privies" in exchange for a settlement payment. ECF No. 6 at PageID.110–11.

Lockhart filed this lawsuit against Gainwell in September 2023, asserting three causes of action: (1) retaliation under the False Claims Act (FCA), 31 U.S.C. § 3730(h); (2) race discrimination under 42 U.S.C. § 1981; and (3) unlawful retaliation under 42 U.S.C. § 1981. ECF No. 1. Lockhart alleges that Gainwell terminated her employment in retaliation for her protected activities under the FCA and for her complaints of racial discrimination and retaliation. *Id.* at PageID.26–31.

In November 2023, Gainwell filed a motion to dismiss Lockhart's complaint under Civil Rule 12(b)(6), arguing that Lockhart had released all her claims against Gainwell in the Release Agreement with DSI and that Lockhart failed to establish that she engaged in protected activity under the FCA or provided sufficient notice to Gainwell of such activity. ECF No. 6.

Lockhart responded in December 2023, arguing that the Release Agreement did not apply to Gainwell and that she adequately alleged FCA-protected activities and provided sufficient notice to Gainwell. ECF No. 13. Lockhart argues that Gainwell's status as a joint employer and not a customer or client should exclude it from the release clause, *id. at PageID.139–40*, and she highlights specific instances where she raised compliance concerns and potential fraud, *id.* at PageID.147–57.

Gainwell replied in January 2024, reiterating that Gainwell falls within the definition of a customer or client of DSI and that Lockhart failed to provide adequate allegations of FCA-protected activity or sufficient notice to Gainwell. ECF No. 14.

## II. THE RELEASE OF LOCKHART'S CLAIMS

### A. Converting Part of Motion to Dismiss into Summary Judgment

When reviewing a motion to dismiss, courts usually consider only the allegations in the complaint. *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (citations omitted). But courts may also rely on "exhibits attached to the complaint, public records, items appearing in the record of the case[,] and exhibits attached to defendant's motion to dismiss"—but only if the complaint relies on them—without having to convert to motion to dismiss into a motion for summary judgment. *Id.* at 680–81 (citing *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008)).

To convert a Rule 12 motion into a Rule 56 motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d). However, notice of such a conversion is only required where one party is "likely to be surprised by the proceedings," which necessarily depends on the facts and circumstances of the particular case. *Wysocki v. IBM Corp.*, 607 F.3d 1102, 1105 (6th Cir. 2010) (quoting *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 204 (6th Cir. 1998)).

Here, neither party will be surprised by this Court converting the motion. "[Gainwell] filed the Settlement Agreement and based most of [its] arguments on its contents," and "[Lockhart] addressed all of those arguments in [her] Response[] and referenced provisions within the Settlement Agreement as well." *SRVR, LLC v.*

*Neidoni*, No. 3:18-CV-00050, 2020 WL 201052, at *2 (W.D. Ky. Jan. 13, 2020). Therefore, this Court will convert Gainwell's motion to dismiss into a motion for summary judgment under Civil Rule 12(d).

To prevail on summary judgment, movants must identify record evidence showing that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a). If so, then the burden shifts to the nonmovant to identify specific facts that create "a genuine issue for trial," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted), which requires more than "a mere scintilla of evidence," *id.* at 251, and more than "metaphysical doubt," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). All inferences must be reasonable, logical, and drawn in the nonmovant's favor to determine whether any party must prevail as a matter of law. *See Liberty Lobby*, 477 U.S. at 251–52.

### B. Interpreting the Release Agreement

When interpreting a settlement agreement, this Court must apply "state substantive law governing contracts." *Cogent Sols. Grp. v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013) (quoting *Bamerilease Cap. Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992)).

In Michigan, courts must discern the parties' intent by interpreting the text of the contract. *Kendzierski v. Macomb Cnty.*, 931 N.W.2d 604, 612 (Mich. 2019)

(citation omitted). If the meaning of the relevant text is unambiguous, then the contract is interpreted and enforced "as written." *Id.* (citation omitted). If ambiguous, then "extrinsic evidence can be presented to determine the intent of the parties." *Id.* (citation omitted). A term is ambiguous if it can reasonably be interpreted in two or more ways. *Id.* (citation omitted). That said, finding ambiguity is a last resort. *Id.* (citation omitted). Courts make such a determination only after exhausting all conventional methods of interpretation. *Id.* (citation omitted).

"Whether a contract term is ambiguous is a question of law," but "the meaning of ambiguous contract language [i]s a question of fact." *Bodnar v. St. John Providence, Inc.*, 933 N.W.2d 363, 373 (Mich. Ct. App. 2019) (citation omitted).

Lockhart seeks to introduce outside evidence to demonstrate that the terms "customer" and "client" unambiguously exclude Gainwell. However, the Release Agreement is fully integrated. *See* ECF No. 6 at PageID.114–15. The Agreement's integration clause forecloses consideration of outside evidence of the parties' intent. *N. Warehousing, Inc. v. Dep't of Educ.*, 714 N.W.2d 287 (Mich. 2006) ("Reliance on pre-contractual representations is unreasonable as a matter of law when the contract contains an integration clause." (citing *UAW-GM Hum. Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411 (Mich. Ct. App. 1998))). Accordingly, "the terms of the policy must control." *Archambo v. Laws. Title Ins.*, 646 N.W.2d 170, 177 (Mich. 2002) (same).

Thus, the next question is whether the meanings of the words "customer" and "client" are ambiguous based on the Agreement's terms. Here, both words are ambiguous because they are both subject to two reasonable interpretations.

The documented relationship involves DSI providing crucial supplies and staffing services to Gainwell, integral to the latter's operations under the Ohio SPBM contract. ECF No. 1 at PageID.5–6. This matches the broad "client" definition involving the "engage[ment of] the professional advice or services of another," as well as being "served by or utilizing the services of" another entity. *See* https://www.merriam-webster.com/dictionary/client. The term "customer" can also apply if Gainwell is seen as purchasing staffing services under the Ohio SPBM contract. *See* https://www.merriam-webster.com/dictionary/customer. Gainwell's receipt of services to fulfill contractual obligations can be interpreted as purchasing services. *See* ECF Nos. 1 at PageID.8; 6 at PageID.93.

Conversely, the Agreement requires DSI "to fully cooperate with any subpoena issued by Lockhart in connection with any litigation she may pursue against Gainwell, including but not limited to providing testimony and/or the production of documents." ECF No. 6 at PageID.114. This suggests that DSI and Lockhart contemplated Gainwell as not being among the entities in the release provision. Without the terms being defined in the Agreement, a jury must decide their meaning.

Lockhart also asserts that Gainwell cannot be a "customer" or a "client" because it was a "joint employer"[1] with DSI. But these identities are not mutually exclusive, as the Michigan Supreme Court has held that an entity "and its customer" may also "be considered dual or coemployers for purposes of" determining whether a statutory liability exemption applied to both entities. *Kidder v. Miller-Davis Co.*, 564 N.W.2d 872, 880 (Mich. 1997).

Given Lockhart's allegations about support and/or services and the record evidence of the relationship between DSI and Gainwell, whether Gainwell was a client or customer of DSI is a jury--triable issue of fact.

### III. LOCKHART'S FCA CLAIM

Gainwell's motion to dismiss also contests Lockhart's FCA retaliation claim but does not rely on evidence outside the complaint. *See* ECF No. 6 at PageID.96–106. Thus, this portion is analyzed as a motion to dismiss.

### A. Standard of Review

Under Civil Rule 12(b)(6), a pleading fails to state a claim if its allegations do not support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the court accepts the

---

[1] "Joint employment occurs when a single employee, under contract with two employers, and under the simultaneous control of both, simultaneously performs services for both employers, and when the service for each employer is the same as, or is closely related to, that for the other." *Holdren v. Lease Mgmt.*, 233 N.W.2d 59, 61 (Mich. Ct. App. 1975).

complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" but must provide "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] formulaic recitation of the elements of a cause of action will not do."). The complaint is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also 16630 Southfield Ltd. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013). If not, then the court must grant the motion to dismiss. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009).

## B. Analysis

### 1. Lockhart Engaged in Protected Activity Under the FCA

Gainwell asserts that Lockhart's activities do not qualify as "protected activity" under the FCA, because they were part of her regular job duties in compliance and were not aimed at preventing fraud against the federal government. ECF No. 6 at PageID.96–103.

Protected activity under the FCA includes lawful actions in furtherance of a *qui tam* action or efforts to stop one or more violations of the FCA. *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018) (citing 31 U.S.C. § 3730(h)(1)). Lockhart, therefore, needs only to have a reasonable belief that her

employer was committing fraud against the United States Government and to show that her efforts were aimed at preventing such fraud. *See McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000).

Gainwell incorrectly attempts to narrow the scope of protected activity. Fraud perpetrated on the federal government may fall within the FCA even when it does not directly and expressly relate to specific payments; any fraudulent attempt to cause the federal government to pay out sums of money can violate the FCA. *Cella v. MobiChord, Inc.*, No. 2:17-cv-527-TC, 2020 WL 416668, at *1, *6 (D. Utah Jan. 27, 2020).

Here, Lockhart alleges that Gainwell "knowingly submitted falsified claims and/or records" about its staff qualifications to the Ohio Department of Medicaid, ECF No. 1 at PageID.2, 11–12, which arguably counts as "a material step toward obtaining" the Ohio SPBM contract. *Cella*, 2020 WL 416668, at *6. Namely, without meeting the eligibility requirements, Gainwell "would not be able to compete for the contract." *Id*. Thus, viewing Lockhart's allegations in the light most favorable to her, she has plausibly alleged that she "engaged in an effort to stop [or reveal] fraudulent information that led to the contract, which would result in presentation of a claim to the federal government." *Id*. In addition, Lockhart specifically alleges that Gainwell was defrauding "the United States of America," ECF No. 1 at PageID.4, and "Medicaid claims submitted to the state [of Ohio] are

- 10 -

also 'claims' to the federal government under the FCA," *United States v. Health All. of Greater Cincinnati*, No. 1:03-CV-00167, 2008 WL 5282139, at *13 (S.D. Ohio Dec. 18, 2008) (citation omitted).

Moreover, although Lockhart's role at Gainwell required her to develop and to implement compliance programs, her specific allegations of fraud—including misstating material information to obtain a contract with the Ohio Department of Medicaid—exceed mere compliance and delve into legal violations that, as discussed above, could potentially defraud the Federal Government's Medicaid funds. And despite her consistent efforts and multiple attempts to rectify these discrepancies internally by addressing them with her superiors, Lockhart's concerns were ignored or dismissed. *Id.* at PageID.4, 11–13. This lack of appropriate action and the later termination of her employment could reasonably suggest retaliation, a circumstance protected under the FCA's whistleblower provisions. ECF No. 1 at PageID.27.

Also, activities beyond simple job performance may confer protection if the employee takes steps to address what reasonably appears to be fraudulent conduct. *See United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 449–50 (6th Cir. 2008). Lockhart merely must allege "that she observed purportedly fraudulent activity, she confronted her employer about it, and her employer fired her because of it." *Id.* at 450. Here, Lockhart's confrontation of alleged fraud and numerous

- 11 -

reports to higher management exceeded her job description and aimed to prevent Gainwell's fraudulent behavior. ECF No. 1 at PageID.13, 15, 18–19. These actions align with efforts to stop FCA violations, establishing a protected activity. *See Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 397 (6th Cir. 2015) ("The FCA prohibits any person from 'knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval.'" (alterations in original) (quoting 31 U.S.C. § 3729(a)(1)(A))).

### 2. Gainwell Had Notice of Lockhart's Protected Activity

Gainwell also says that it was not on notice that Lockhart was engaging in protected whistleblower activities, as her actions fell within her job scope. ECF No. 6 at PageID.103–06.

Although compliance officers have a higher burden to establish notice, *United States v. Cookeville Reg'l Med. Ctr. Auth.*, No. 2:15-CV-00065, 2021 WL 4594784, at *8 (M.D. Tenn. Oct. 6, 2021) (citation omitted), Lockhart's allegations sufficiently demonstrate that Gainwell was clearly aware of her concerns of fraud. ECF No. 1 at PageID.13–14, 63–64, 67–70. Her complaint details specific interventions, significant protests, attempts to escalate issues, and direct accusations of fraud against fellow officers. ECF No. 1 at PageID.13–15, 17–20, 80. The plausible inference is that Lockhart's activities should have put Gainwell on notice.

When evaluating employer notice of an employee's protected activity, courts consider whether the employee communicated that she was acting to stop fraud against the United States Government. *See United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 202 (4th Cir. 2018).

Here, Lockhart detailed numerous instances in which she not only identified but also vocally opposed fraudulent practices within Gainwell. ECF No. 1 at PageID.13–15, 17–18. She articulated objections and compliance concerns through various communications—including meetings and direct emails to high-ranking executives like Gainwell's Vice President of Pharmacy and the Corporate Compliance Officer. *Id.* at PageID.13–15, 17–20. Thus, notice was sufficient. *See U.S. ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 449 (6th Cir. 2008).

Further, Lockhart consistently relayed that failure to adhere to compliance requirements and submitting inaccurate records for reimbursement from the United States Government were fraudulent under the FCA. Notably, she communicated these concerns in writing and through formal channels, including official meetings and documented memos. *Id.* at PageID.13–15, 17–20, 80. Her persistence, despite significant pushback and dismissal by her superiors, underscores her commitment to addressing and preventing fraud, activities that undoubtedly exceed standard job duties of compliance oversight. *See U.S. ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 608 (S.D. Tex. 2012) ("[I]f an employee wants to impute knowledge

to the employer for purposes of the second prong of the analysis, he must specifically tell the employer that he is concerned about possible fraud." (citation omitted)).

Moreover, Lockhart's specific charge that fellow compliance officer, Anne Terwilliger, was committing fraud is a direct and explicit claim that Gainwell should have understood as her engagement in protected activity under the FCA. *See* ECF No. 1 at PageID.12. By dismissing these efforts, Gainwell not only undermined the role of its compliance program but also acted in a manner that could be perceived as retaliatory, particularly given the temporal proximity between her protected activities and later termination. *See Marlar*, 525 F.3d at 450 (finding retaliation sufficiently pleaded if the plaintiff "alleges in her complaint that because she informed [the defendant] of her concerns, she was terminated" (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003))).

In sum, Lockhart has alleged sufficient facts to support her claim of engaging in protected activity aimed at stopping FCA violations and Gainwell's awareness of these activities. Accordingly, the motion to dismiss Lockhart's FCA-retaliation claim will be denied.

### C. Next Steps

This Court acknowledges the unusual posture of having some issues ripe for jury resolution while others have merely cleared the dismissal phase, pending discovery or summary judgment. What will occur is that the issue of whether the

Release Agreement absolves Gainwell of liability will be a jury question, not presented unless at least one of Lockhart's claims survives summary judgment. If at least one claim proceeds to trial, then it will be presented to the jury alongside the effect of the Release Agreement.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's Motion to Dismiss, ECF No. 6, is **DENIED**.

**This nonfinal order does not close the above-captioned case**.

> */s/Susan K. DeClercq*
> SUSAN K. DeCLERCQ
> United States District Judge

Dated:  8/22/2024